OPINION OF THE COURT
 

 Rosenblatt, J.
 

 Defendant was convicted of murder for brutally bludgeoning and strangling his paramour. After a neighbor complained to police about an overwhelming odor emanating from defendant’s apartment on Herkimer Street in Buffalo, officers entered and found the victim’s decomposing body in the closet. Defendant argues that because the police did not have a search warrant, the body and all evidence stemming from its discovery must be suppressed. We conclude that no warrant was required because the police were responding to an emergency. We therefore affirm defendant’s conviction under the emergency exception to the Fourth Amendment’s warrant requirement.
 

 L
 

 In late July 1999, defendant and the decedent were having sex and smoking crack in defendant’s apartment when the two had words. Defendant ended the argument, and the victim’s life, by smashing her face with a mallet and then strangling her with a brassiere. After the victim’s death, defendant left the body in a closet.
 

 On August 7, a 911 caller alerted police to a “strange odor” at defendant’s apartment building. Responding to the scene,
 
 *330
 
 the officers spoke to the complaining neighbor, Grimaldi Pomales. He told the officers that defendant’s apartment was just below his, and that he had to vacate his own apartment because the smell emanating from defendant’s apartment was unbearably putrid. The police confirmed that the “rotting” smell came from defendant’s apartment. Although the smell surely suggested it, the police could not have said with certainty that it was caused by a rotting body.
 

 The officers knocked on the door of defendant’s apartment, but no one answered. They then tried to open the door, but it was locked. They waited for maintenance personnel, who arrived after about half an hour but did not have a key to defendant’s apartment. Police asked about reaching defendant’s family members but learned that none could be contacted. The officers then considered entering the apartment from the fire escape, but decided it would be too dangerous. Having assessed the various alternatives for approximately an hour, the officers concluded that it was necessary to force their way in. After ordering the maintenance personnel to pry the door open, the police entered the apartment, using charcoal face masks as protection.
 

 Once inside, the police found vermin throughout the apartment. One window was completely blackened by flies. They saw a pair of socks protruding from a closet, and when they opened its door they found the body, severely decomposed and covered with maggots. The officers then left, securing the premises. Following an investigation, defendant was charged with murder.
 

 After indictment, defendant moved to suppress the body and all evidence flowing from its discovery. Supreme Court denied the motion in relevant part, holding that when the police entered the apartment they were acting as community caretakers — not as criminal investigators — and that the situation facing them presented an emergency “concerning the health and welfare of’ all the tenants in the building.
 

 With one Justice dissenting, the Appellate Division affirmed defendant’s conviction (288 AD2d 911 [2001]), sustaining the police entry based on the “emergency” exception to the Fourth Amendment’s warrant requirement
 
 (see generally People v Mitchell,
 
 39 NY2d 173 [1976]). The Court held that the cause of the smell could not be ascertained except by entering the apartment, and because the smell was suggestive of harm to anyone inside the apartment, the police were justified in enter
 
 *331
 
 ing without a warrant. In dissent, Justice Green argued, in essence, that a smell does not constitute an “emergency,” and granted the defendant leave to appeal (97 NY2d 690 [2001]). We now affirm.
 

 II. The Emergency Exception to the Warrant Requirement The Fourth Amendment provides that
 

 “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.”
 

 Courts have long recognized that the Fourth Amendment is not violated every time police enter a private premises without a warrant. Indeed, though warrantless entries into a home are “presumptively unreasonable”
 
 (Payton v New York,
 
 445 US 573, 586 [1980];
 
 see also Coolidge v New Hampshire,
 
 403 US 443, 474-475 [1971]), “[t]he touchstone of the Fourth Amendment is reasonableness” — not the warrant requirement
 
 (United States v Knights,
 
 534 US 112, 118 [2001]).
 

 Recognizing this principle, the Supreme Court has crafted a number of “carefully delineated” exceptions to the Fourth Amendment’s Warrant Clause
 
 (Welsh v Wisconsin,
 
 466 US 740, 749-750 [1984]).
 
 [1]
 
 Our inquiry centers on the contentions of the parties as to the need for a search warrant. Defendant asserts that the warrantless entry was illegal. The People argue that the entry was justified because the police were acting within the “emergency exception to the warrant requirement.”
 

 Police are required to serve the community in innumerable ways, from pursuing criminals to rescuing treed cats. While the Fourth Amendment’s warrant requirement is the cornerstone of our protections against unreasonable searches and seizures, it is not a barrier to a police officer seeking to help someone in immediate danger (see
 
 e.g. Mitchell,
 
 39 NY2d at 177;
 
 see also e.g. Mincey v Arizona,
 
 437 US 385, 392 [1978]).
 
 *332
 
 Indeed, “[p]eople could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process”
 
 Wayne v United States,
 
 318 F2d 205, 212 [DC Cir 1963] [Burger, J., concurring]). Accordingly, “what would be otherwise illegal absent an * * * emergency” becomes justified by the “need to protect or preserve life or avoid serious injury”
 
 (id.).
 

 In
 
 Mitchell,
 
 the Court applied the emergency exception and held that the Fourth Amendment did not prohibit police from entering the defendant’s hotel room when looking for a chambermaid who had been missing for approximately five hours and was last seen on the defendant’s floor. As part of a search of the rooms on that floor, they entered the defendant’s room where they found a hatchet and the maid’s corpse. Our holding stressed the importance of the officers’ motivation in undertaking the search. They inspected the defendant’s room not to solve a crime or obtain evidence against the defendant,
 
 [2]
 
 but in the hope that they could find, and perhaps assist, a missing person.
 

 In sustaining the warrantless search in
 
 Mitchell,
 
 we laid out three prerequisites to invoke the emergency exception. First, “[t]he police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property”
 
 (Mitchell,
 
 39 NY2d at 177). “[T]he protection of human life or property in imminent danger must be the motivation for the search”
 
 (id.
 
 at 178). Second, “[t]he search must not be primarily motivated by intent to arrest and seize evidence”
 
 (id.
 
 at 177). Third, “[t]here must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched”
 
 (id.
 
 at 177-178). Only the first issue is contested in this appeal.
 

 In addressing the emergency exception, both sides rely on
 
 Mitchell.
 
 The People assert that the case before us meets
 
 Mitchell’s
 
 emergency requirements. Defendant argues that here, as a matter of law, there was no “emergency,” considering that the police allowed an hour to go by before they decided to break in. We agree with the People and conclude that the measured response of the police does not remove the situation from the realm of emergency. Indeed, and most commendably,
 
 *333
 
 the police spent about an hour exploring alternatives before forcing their way in. Had there been a fire or screams signifying danger, the police would have been fully justified in forcing the door without a moment’s delay.
 

 Not all emergencies are the same. In some, a person’s life may hinge on the passage of mere seconds, demanding immediate police action. In others, police must act with reasonable swiftness but their response need not be calculated in seconds.
 
 [3]
 
 Moreover, reasonableness requires police to tailor responses (and their levels of intrusiveness) to the nature of the emergency. At one extreme, they are authorized — if not expected — to break into a premises when, for example, there is a shooting in progress or a hostage held. At the other extreme, we neither want nor authorize police to seize people or premises to remedy what might be characterized as minor irritants. People sometimes create cooking odors or make noise to the point where neighbors complain. But as we live in a free society, we do not expect the police to react to such relatively minor complaints by breaking down the door.
 

 The Fourth Amendment’s warrant requirement was not meant to apply to situations where police reasonably need to enter a premises for a legitimate, benevolent purpose distinct from crime-fighting.
 
 [4]
 
 The Fourth Amendment’s incorporation against the states
 
 (see Wolf v Colorado,
 
 338 US 25, 27-28 [1949]) has accommodated the varied responsibilities of the local constable
 
 (see Cady v Dombrowski,
 
 413 US 433, 440-441 [1973] [acknowledging the need for an adaption of Fourth Amendment jurisprudence after
 
 Mapp v Ohio
 
 (367 US 643 [1961]) to reflect the different duties of local, as opposed to federal, law enforcement officials]). Thus, the Supreme Court has crafted its Fourth Amendment jurisprudence recognizing the varied public service roles of local police officials.
 

 
 *334
 
 Defendant’s argument that, as a matter of law, there was no emergency (and that police could have and should have obtained a search warrant) fails for four reasons. To begin with, the defense has not told us what such a warrant would entail, and when asked, could offer no suggestion as to naming the crime involved or, as required by the Fourth Amendment, “the things to be seized.”
 
 [5]
 
 And that is the core problem with defendant’s position. Before entering the apartment, the police encountered no evidence of any crime, and the circumstances did not lend themselves to criminal processes. The police were not functioning in a criminal arena, but acting as public servants in the name of protecting public health and safety. They proceeded with restraint and took the time to deliberate, using force only after exhausting other reasonable avenues.
 

 Secondly, we are not impressed by defendant’s suggestion, implicit in his argument, that the entry could be constitutional under the emergency exception only if the police broke in immediately. Defining an emergency with the rigidity defendant proposes may encourage police — so as to give their actions the appearance of an emergency — to break in prematurely, before exhausting other reasonable means of gaining access. It would be an ironic result were we to “punish” the constabulary by suppressing the evidence merely because they took the time to exercise judgment and circumspection before resorting to force. The appropriately measured response of the police should not be declared illegal merely because they thoughtfully delayed entry for a relatively brief time.
 

 Thirdly, in
 
 Mitchell,
 
 the maid had been missing for several hours. The police made energetic, time-consuming efforts (including a search of the hotel basement, roof, air ducts, alleyways and an adjoining restaurant) before they searched the defendant’s room
 
 (see Mitchell,
 
 39 NY2d at 176).
 
 Mitchell’s
 
 requirement of immediacy must be considered in that light. Just as the situation facing police in
 
 Mitchell
 
 was no less an
 
 *335
 
 emergency after the time it took them to search other parts of the hotel, so the situation facing the police here was an emergency notwithstanding the passage of an hour between their arrival at the building and their entry into the apartment.
 

 In fact,
 
 Mitchell
 
 contemplated that the discovery of a body would constitute an emergency. In discussing the emergency exception’s requirement that there be a close nexus between the place to be searched and the emergency, the
 
 Mitchell
 
 Court posited “obvious signs” of such a nexus, including “the odor of a decaying corpse” (39 NY2d at 179
 
 [citing People v Brooks,
 
 7 Ill App 3d 767, 289 NE2d 207 (1972)]).
 

 Lastly, no person — let alone a murderer — can, in the name of constitutional privacy, expect to harbor a dead body without generating official cognizance and action. As defendant concedes, a public official would have been required to enter the apartment at some point, regardless of whether that official could obtain a warrant. Defendant, therefore, would have us approve the warrantless entry by public health officials, but not by the police. Under the circumstances, there is no basis in law for such a distinction.
 
 [6]
 
 As public officials, police and public health officials would be performing exactly the same task, and the interdictions of the Fourth Amendment would apply equally to both
 
 (see e.g. Michigan v Tyler,
 
 436 US 499, 506 [1978];
 
 G.M. Leasing Corp. v United States,
 
 429 US 338, 358 [1977];
 
 Camara v Municipal Ct.,
 
 387 US 523, 534 [1967]).
 

 Having rejected defendant’s assertion that, as a matter of law, the passage of an hour negates the existence of an emergency, we note that the lower courts determined that exigent circumstances existed to justify the warrantless entry into defendant’s apartment. Inasmuch as this determination involves a mixed question of law and fact having support in the record, any further review is beyond this Court’s jurisdiction
 
 (see People v Brown,
 
 95 NY2d 942, 943 [2000]).
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Graffeo concur.
 

 Order affirmed.
 

 [1]
 

 . The most common examples are searches incident to arrests (see
 
 New York v Belton,
 
 453 US 454 [1981]), consent searches (see
 
 Schneckloth v Bustamonte,
 
 412 US 218 [1973]), inventory searches (see
 
 Colorado v Bertine,
 
 479 US 367 [1987]) and searches conducted at borders (see
 
 United States v Villamonte-Marquez,
 
 462 US 579 [1983]). One enterprising researcher has listed over 20 exceptions to the warrant requirement (see Craig Bradley,
 
 Two Models of the Fourth Amendment,
 
 83 Mich L Rev 1468, 1473-1474 [1985]).
 

 [2]
 

 . Indeed, at the time of the search “it was not known whether [the maid] had been stricken with some illness, suffered an accident or possibly fallen victim to a crime” (Mitchell, 39 NY2d at 178). This uncertainty illustrates the varying nature of police work and the difficulty in determining whether a particular action may ultimately entail a criminal investigation.
 

 [3]
 

 .
 
 See People v Lanthier,
 
 5 Cal 3d 751, 755-756, 488 P2d 625, 628 (1971) (holding constitutional the search of a locker and briefcase found to be emitting a noxious odor in a university study hall, resting the holding on the emergency doctrine).
 

 [4]
 

 . We note that this motivation requirement parallels the same requirement in the emergency exception. If there is an emergency, the police may enter without a warrant even though they believe that the search may lead to the discovery of evidence of a crime
 
 (see Mitchell,
 
 39 NY2d at 178-179 [“Of course, the possibility that criminal agency could account for the danger may be present. * * * Therefore, even if the possibility of the involvement of criminal agency was present in the minds of the searching officers, this contingency was not the primary motivation for the search of appellant’s room.”]).
 

 [5]
 

 . There have been instances in which search warrants have been obtained to remove nuisances. Warrants of that type, however, deal largely with locales where criminal activity is afoot and contraband is seizable (see
 
 City of New York v 924 Columbus Assoc.,
 
 219 AD2d 19 [1996],
 
 appeal dismissed
 
 88 NY2d 979). As one court noted, “[i]f a warrant cannot be obtained under these circumstances, we can only conclude that the warrant mechanism is unsuited to the type of situation presented in this case”
 
 (United States v Rohrig,
 
 98 F3d 1506, 1524 n 9 [1996] [analyzing the defendant’s suggestion that breaching the peace was not serious enough to justify the issuance of a warrant]). We need not pass on whether a search warrant may be issued under the circumstances before us, and if so, how it would read.
 

 [6]
 

 . There is no basis for such a distinction in the Buffalo City Charter, either. That document charges
 
 the police department
 
 with, among other things, the duty “to safeguard the public health” (Charter and Code of City of Buffalo, art 13, § 13-9).